THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. KEITH M., Defendant-Appellee.

Second District   No. 2—92—0328

Opinion filed December 20, 1993.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, Lisa A. Hoffman, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Thomas A. Briscoe, of Will & Briscoe, Ltd., of Waukegan, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:
Defendant, Keith M., was charged with one count each of (1) unlawful possession of a controlled substance, methaqualone, with intent to deliver (Ill. Rev. Stat. 1991, ch. 56½, par. 1401(a)(9) (now 720 ILCS 570/401(a)(9) (West 1992))); (2) unlawful possession of a controlled substance, methaqualone (Ill. Rev. Stat. 1991, ch. 56½, par. 1402(a)(9) (now 720 ILCS 402(a)(9) (West 1992))); (3) unlawful possession of less than 15 grams of a controlled substance, cocaine (Ill. Rev. Stat. 1991, ch. 56½, par. 1402(c) (now 720 ILCS 570/402(c) (West 1992))); (4) unlawful possession, with intent to deliver, of more than 30 and no more than 500 grams of cannabis (Ill. Rev. Stat. 1991, ch.

56½, par. 705(d) (now 720 ILCS 550/5 (West 1992))); and (5) unlawful possession of more than 30 but not more than 500 grams of cannabis (Ill. Rev. Stat. 1991, ch. 56½, par. 704(d) (now 720 ILCS 550/4(d) (West 1992))).

The State appeals (see 134 Ill. 2d R. 604(a)) from a trial court order granting defendant's motions to quash his arrest and to suppress evidence that defendant alleged was the fruit of an unconstitutional search of defendant's residence.

The principal issue on appeal is whether the trial court erred in finding that the search was not a valid consent search because the defendant's housekeeper lacked either real or apparent authority to consent to the search of the defendant's bedroom. We hold that the trial court's decision was supported by the evidence, and we affirm the order of suppression.

We start with the basic and undisputed facts. At all relevant times, defendant resided with his minor daughter, K.M., in his two-story house in Highland Park. On the morning of November 14, 1991, Myriam Giron, who was defendant's housekeeper and K.M.'s baby-sitter, permitted two Highland Park police officers, a Lake County deputy sheriff, and an investigator for the Department of Children and Family Services (DCFS) to enter the house so that they could discuss a possible case of sexual abuse involving defendant and K.M. Defendant was at work at the time.

While Giron was sitting in the first-floor living room discussing her reasons to suspect that defendant had abused K.M., she mentioned that defendant stored pornographic videotapes in his bedroom on the second floor of the house, where Giron regularly put away defendant's laundry and did some other housework. The officers asked whether the tapes involved K.M. or other children. Giron responded that she did not know whether these pornographic tapes might involve K.M. Giron offered to take the officers to the bedroom and show them the tapes. The officers agreed. While standing in or near defendant's bedroom, one or more of the officers noticed cannabis and drug paraphernalia in plain view in a nightstand and a closet. Previously, Giron had told the officers that K.M. said that defendant had a safe in the basement where he kept "white stones" that he smoked.

After viewing defendant's bedroom, the officers left the house and obtained a warrant to search the house for evidence of controlled substances. Later that day, they executed the warrant. Defendant came back from work. The police arrested him and searched him and his car, finding more evidence of drug offenses. In police custody,

defendant made statements to the police. Charges stemming from any allegations of sexual abuse are not evident from the record or involved in this appeal.

Defendant filed three pretrial motions relevant here: (1) a motion to quash his arrest and to suppress the evidence that the police seized from his vehicle; (2) a motion to suppress the statements that defendant made after he was taken into custody; and (3) a motion to suppress the evidence seized pursuant to the warrant from his bedroom. Defendant alleged that his arrest and all the evidence seized were the fruits of the warrantless search of his residence. The trial court agreed with defendant that the police conducted an unconstitutional search of the bedroom and that all the evidence defendant sought to suppress was inadmissible as the "fruit of the poisonous tree." The trial court granted defendant's motions.

We now summarize the testimony from the hearing on the defendant's motions. Defendant testified that on November 14, 1991, he resided with his five-year-old daughter at his house in Highland Park, Illinois. He and his daughter had separate bedrooms. Defendant's bedroom was on the second floor at the end of a long hallway. It was not visible from the first floor or from the stairway to the second floor.

At 8 a.m. that day, defendant left for work. When he left, his bedroom closet and the drawers to the nightstand next to his bed were closed. Defendant always made sure the closet and bedroom drawers were closed, as he had a small child and two pets. That day, he gave nobody permission to search his bedroom or the bedroom closet, the rest of his residence, or his vehicle.

Defendant acknowledged that, on November 14, 1991, Myriam Giron was employed as his housekeeper, a job she had held since the end of July 1991. Giron's hours were 8 a.m. to 6 p.m. Monday through Friday. Giron had a key to the house, but she did not live at the M. residence or keep any clothing or other possessions there. She was not related to defendant, had never cohabited with him, and had never been an overnight guest in his house or slept in his bedroom.

Defendant testified that he did not permit Giron to invite guests to his house, although K.M.'s friends were welcome. Giron had once invited her roommate over, but defendant reprimanded Giron after he found out. To defendant's knowledge, the only other visits Giron's roommate made were when she picked up Giron at the end of the workday.

Giron had certain duties that defendant had specified in a written list that he gave her when she started. These duties consisted in part of baby-sitting K.M., preparing the child for school, and being at the

residence when K.M. returned from school. The rest of Giron's duties involved housekeeping matters, such as cleaning, doing laundry, and changing bed sheets. Defendant provided her with phone numbers that she might need in an emergency. These included the numbers of family members, but not of the police or fire department. Defendant never told Giron to call the police if there was an emergency; furthermore, he warned her not to discipline K.M. by threatening to call the police if the girl misbehaved.

Giron's housekeeping duties included putting away some of the socks that she washed for defendant. The socks that she washed were to be put into a dresser underneath the bedroom window. Giron was not to put any socks into the dresser inside the closet. Defendant kept heavy winter socks in this dresser. Giron was not allowed to open either this dresser or the nightstand by defendant's bed, and her laundry chores did not require her to open any of the drawers to either of these.

Defendant testified that, as of the time he left for work on November 14, 1991, there was no marijuana or drug paraphernalia lying around the house. His bedside nightstand contained some marijuana, and the dresser closet contained some sexually oriented videotapes and some "Playboy" magazines.

Myriam Giron was the State's first witness. She testified as follows. She lived in Highwood and began her employment for defendant at the end of July 1991. Her duties were as defendant described them. Admittedly, defendant told Giron at the outset that she was not to open or touch certain drawers in defendant's bedroom, including the drawers of the bedside nightstand. Also, defendant never asked her to arrange or organize his video cassette tapes. However, according to Giron, she washed defendant's heavy white socks routinely (including shortly before the day defendant was arrested) and put them into the dresser closet that contained the sexually oriented video cassettes. She could tell by the titles that these videos were pornographic, and she partially confirmed this inference on one occasion by viewing one of the tapes.

Giron had invited her roommate over several times, usually to accompany Giron and K.M. to the park. Defendant never specifically told Giron not to invite people to defendant's house. Defendant and Giron never discussed the issue of visitors, but defendant was aware, in part via K.M., that Giron had had visitors over. Defendant never got angry at her for inviting anyone over. The emergency numbers defendant gave Giron included those of the police and fire departments. Giron often saw marijuana that defendant left in the open in

his bedroom, the dining room, and the living room. Defendant's bedroom smelled of marijuana frequently, including on November 14, 1991.

Usually, defendant left open the door to his closet and the drawers to his bedside nightstand. Two of the four drawers to the nightstand were open on the morning of November 14, 1991, as was the bedroom closet. With the closet open, the triple-beam scale on top of the dresser was in plain sight.

Giron detailed the events that led her to request that the police come over to the house. Approximately one month prior to November 12, 1991, while she was changing K.M.'s clothing, Giron noticed that there was a little redness in the girl's vaginal area; however, she did nothing about it at that time. On November 12, 1991, Giron told K.M. that Giron would soon be leaving for Guatemala; K.M. started crying. Giron said she would not leave. K.M. stopped crying and they went upstairs. K.M. asked Giron if the latter would like to know a "big secret." At the girl's urging, Giron accompanied K.M. to the basement and the safe that defendant kept there. They tried to open the safe, but it was locked.

Giron and K.M. went back upstairs. When Giron asked K.M. what K.M. and defendant did after Giron went home, K.M. offered to tell Giron a secret that Giron could not tell anyone. This "secret" was that defendant and K.M. "played doctor." Giron was starting to suspect "things." Her suspicions were confirmed when K.M. demonstrated how defendant touched her when they "played doctor." Also, K.M. told Giron that she would bite defendant's "pee-pee" and would drink her "daddy's pee pee."

Giron called her mother, Myriam Montrroso, and told her what she had just learned. After Giron returned home on November 12, she learned that her mother had called the police. Late that evening, Officers David Schwarz and Joel Cohen, with whom Giron had become acquainted from an unrelated matter, interviewed Giron at her apartment. Giron told the officers that since July of that year she had been defendant's housekeeper and had been in charge of taking care of K.M. She told the officers what had happened that day. After the interview, the officers told her that they would call her and that they would contact DCFS.

At about 10:30 a.m. on November 14, Officers Schwarz and Cohen, Lake County deputy sheriff Lenny Brezinski, and DCFS investigator Mark Pleasant went to the M. home. Giron admitted the four men into the house. The four officials and Giron sat in the living room or dining room on the first floor. After they met K.M., Schwarz and

Pleasant accompanied the girl downstairs for an interview. In the meantime, Giron told Cohen and Brezinski what K.M. had told her; she also wrote this information up in a report. Accompanied by Cohen and Brezinski, Giron went downstairs several times to talk to K.M., returning to the first floor each time accompanied by Cohen and Brezinski. As Pleasant interviewed K.M., Schwarz joined the other people on the first floor.

After she finished writing her report, Giron told the officers that defendant kept some pornographic videos in the dresser where he kept his socks. She asked the officers if they wanted to come upstairs to defendant's bedroom to see the videos. When she was informed that they wanted to see the videos, Giron led Cohen and Brezinski to defendant's bedroom. (Giron's testimony was not clear as to whether or when either Schwarz or Pleasant came upstairs.)

When Giron entered defendant's bedroom, she noticed that two of the drawers to the bedside nightstand were open. The closet was open also. Giron went to the drawer of the dresser closet that contained the pornographic videos. She opened the drawer and took the videos. She did not remove them but put them back into the drawer after Officer Cohen directed her attention to the nightstand and to the scale in the closet. Giron told Cohen that she knew that defendant used marijuana. The officers did not disturb the nightstand drawers or the closet. The officers then left the residence.

Giron recalled that, on the morning of November 14, 1991, she never told the officers that they could look around the house. She never saw any of the men going from room to room or looking into rooms other than as she testified.

Highland Park police detective David Schwarz testified that, early in the evening of November 12, 1991, Myriam Montrroso, whom he knew from an unrelated matter, telephoned him and told him what her daughter Myriam Giron, who baby-sat for defendant, had told Montrroso. Montrroso knew defendant's home telephone number but not his address.

Later that evening, Schwarz and Cohen interviewed Giron at Giron's Highwood apartment. Giron told the officers that she had been defendant's housekeeper and baby-sitter since the end of July. She took care of K.M. while defendant worked. She had a key to defendant's residence, and defendant allowed her to have visitors, including her roommate and her mother. Defendant had supplied her with a list of emergency phone numbers, including those for the police, fire department, and hospital. At all relevant times, Schwarz knew that Giron was not related to defendant, that she had her

own apartment, and that she did not reside at defendant's house as either an owner or a renter. At trial, Schwarz could not recall whether Giron told him if she kept any of her clothing or furniture at defendant's house.

According to Detective Schwarz, Giron recounted that, shortly after she started work, she noticed various kinds of pornographic materials, including videos and magazines, in the M. house. Early in September, she observed the unusual redness in K.M.'s vaginal area, and eventually K.M. told her about how defendant and K.M. "played doctor." Giron also related the conversation with K.M. about the "big secret" in the downstairs safe. Giron told the officers that K.M. had told her that the safe contained white stones that defendant smoked and white material that defendant put on his cigarettes. Giron said that K.M. had described these items as "daddy's medicine."

The officers told Giron they would contact DCFS. They did so the next morning. Schwarz, Cohen, Brezinski, and Pleasant met on the morning of November 14 and decided that it would be best to interview both K.M. and Giron at the M. home. After calling Giron, the four men arrived at defendant's house at about 10 a.m. According to Schwarz's testimony, the sole motivation for the visit was concern for K.M. and the allegations that she had been sexually abused. However, Schwarz admitted that, when he visited the house, he had reason to believe that illegal drugs and pornography were inside the home.

The four men went to the house. One rang the doorbell, and Giron answered and let them in. The officers could not see defendant's bedroom from the first floor, and there was no odor of marijuana detectable as they walked into the house. The interviews proceeded as Giron described in her testimony. While Pleasant was talking to K.M., Schwarz came upstairs, where Cohen informed him that Giron had said that defendant had pornographic films in the house. The officers asked Giron whether these might include child pornography. Giron said she did not know. She invited the men upstairs to find out. Schwarz, Cohen, and Brezinski followed her to defendant's bedroom. Before he went to the room, Schwarz did not suspect that it might contain cannabis. He went there to look at the videos, not to search for drugs. He had made no attempt to discover the contents of the basement safe. He had seen no evidence of illegal drugs anywhere in the house until he went to defendant's bedroom. On the morning of November 14, 1991, Schwarz did not

explore the residence on his own and did not open any drawers or doors.

Immediately upon entering the room, Schwarz saw that two of the drawers to the bedside nightstand were partially open; in one of the drawers was a clear baggie containing a green leafy substance, rolling papers, and a pipe for consuming cannabis. The odor of marijuana was readily apparent from the drawer. The officers did not seize anything that morning. As Giron was pulling some tapes out of the closet dresser drawer, the officers told her to put the videos back. They decided to leave the house and obtain a search warrant while other officers kept the house under surveillance from the outside.

At about 5:20 p.m., the officers obtained a search warrant signed by Judge Christopher Starck. As Schwarz proceeded to the house to help execute the warrant, he was informed that defendant had returned and that, after a police officer had sighted cannabis in defendant's car, defendant had been arrested. A search incident to the arrest revealed marijuana on defendant's person. Defendant was taken into custody. Later, he received a copy of the warrant, was given *Miranda* warnings, and made some statements. Schwarz helped to search the house pursuant to the warrant. The officers found cannabis in numerous locations, primarily defendant's bedroom. Cocaine residue and paraphernalia were in the basement safe. In defendant's bedroom were 836 tablets of methaqualone and a "Cocaine User's Guide."

Officer Joel Cohen next testified. He recalled that, when he and Schwarz first interviewed Giron, she informed the officers that she was defendant's housekeeper and baby-sitter. She told Schwarz and Cohen that she had a key to defendant's home, but that in general her work hours were during the daytime Monday through Friday. She stated that her roommate and her mother had visited her. She did not remember how many times she had had visitors; the officers did not press her on the matter.

Officer Cohen's account of the initial visit to the M. residence was generally consistent with Officer Schwarz's testimony. When Giron mentioned the pornographic videos, Cohen asked if any of them might contain child pornography. Giron replied that she did not know, but that she would show the officer where defendant kept his pornographic materials.

The officers followed Giron to defendant's bedroom. Giron entered first and Cohen entered next. Giron went to the area of the closet. Just before Cohen entered the room, he saw the nightstand

with two drawers open, and he noticed that one of the drawers contained rolling papers, a cannabis pipe, and a baggie with a brown crushed substance that appeared to be marijuana. Also, the room smelled of marijuana. When Cohen looked in Giron's direction, he saw the triple-beam scale, which was in plain view on a shelf above the dresser closet. As Giron started to pull the tapes out of the dresser, Cohen, who was four to six feet away from her, told her to put the tapes back. Giron did so. Cohen told Schwarz and Brezinski that he had seen marijuana. The officers seized nothing that morning, but decided to obtain a search warrant.

Cohen testified that, while he was at defendant's house the morning of November 14, 1991, he did not leave Giron's presence, wander about the house, open any doors or drawers, or attempt to open the basement safe. The reason for the visit was to investigate the possible sexual abuse. Cohen saw no evidence of illicit drugs in the house until he went to defendant's bedroom. He acknowledged on cross-examination that he had to step into the bedroom itself before he was able to see into the nightstand drawer that contained the marijuana.

DCFS investigator Mark Pleasant testified that he and the three police officers involved in the investigation decided that it would be most productive to talk to K.M. at her own home, as was often done with alleged sexual abuse victims. Pleasant interviewed K.M. and did not participate in the examination of defendant's bedroom. Cohen and Brezinski informed him that they believed there was evidence of illegal drug use in the house, and Pleasant went with them to obtain the search warrant. While he was in defendant's house on the morning of November 14, 1991, Pleasant did not open any drawers or attempt to open the basement safe. He did not see anybody else attempt to open any drawers or the safe.

The State's final witness, Lenny Brezinski, described the events of the morning of November 14, 1991. When Giron invited Cohen, Schwarz, and Brezinski upstairs to investigate the "dirty movies" (in her words), she entered defendant's bedroom first. Soon, all three officers present entered the room also. No drugs or drug-related materials were in view until they entered the room. As Cohen entered the room, he looked to his left and pointed to the open drawers in the nightstand. Brezinski eyed one of these drawers, which had been open when he entered the room, and saw a bag with a brown leafy substance. Giron had the tapes in her hand; the officers told her to return the tapes, which she did, and the officers left the house.

After the testimony was finished, the trial judge stated that the officers' activities in the defendant's bedroom amounted to a search, as the officers were looking for evidence of a crime (*i.e.*, the pornographic tapes). The trial judge held further that, if this search was invalid, all of the searches that followed were also invalid as the "fruit of the poisonous tree"; thus, if the initial search was unconstitutional, the court would grant the defendant's motions in full. The prosecutor agreed that the validity of the subsequent searches hinged on the validity of the initial search of the bedroom.

The trial judge held that the warrantless search of defendant's bedroom was unconstitutional. The judge made the following factual findings. The police and Pleasant went to the M. residence on the morning of November 14, 1991, to investigate the allegations of sexual abuse and not to look for drugs. As the police entered the residence on the morning of November 14, 1991, they did not detect the scent of marijuana or any other indicia of illegal drugs. Nothing the officers saw on the first floor or in the basement would have given them probable cause to believe that defendant was violating the drug laws. It was only after the police finished interviewing Giron and K.M. that Giron told them that defendant stored pornographic materials in his bedroom. At her invitation, the police went to the second floor to look for pornography that might be relevant to the allegations of child sexual abuse.

The judge found further that there were certain places, including certain drawers, that defendant had specifically told Giron not to explore or disturb. Also, the trial judge believed defendant's testimony that he never authorized Giron to have visitors over to defendant's house.

The judge held that the search of the second-floor bedroom was invalid. The judge observed that the only possible justification for the warrantless search was consent. The judge then explained his conclusion that Giron possessed neither actual nor apparent authority to consent to the search of defendant's bedroom. The judge emphasized that Giron was not a cotenant of the premises or one who shared equal rights in the property with defendant. Although she had a key to the house, she had the right to enter the house only for the limited purposes of caring for K.M. when necessary and doing limited housekeeping.

The court concluded that the officers' observations of the second floor of the house were the basis for the search warrant and all subsequent searches and seizures. Because the police gained original access to the bedroom by unconstitutional means, it was not impor-

tant that, once they were there, they saw the various incriminating objects in plain view.

The court concluded that Giron had no authority to consent to the search of defendant's bedroom and that the officers could not have reasonably believed, based on what they knew, that she had such authority. The court granted defendant's suppression motion in full. The State timely appealed.

On appeal, the State argues that (1) the search of defendant's residence was constitutional; (2) defendant's arrest was constitutional; (3) the search of defendant immediately following his arrest was proper; and (4) the search of defendant's vehicle was proper.

■■ We summarily dismiss all but the first of these arguments, as they have been waived. It is well established that the waiver rule applies to the State as well as to the defendant. (*People v. O'Neal* (1984), 104 Ill. 2d 399, 407.) On appeal, the State may not urge reversal of a suppression order by invoking a theory that it did not advance at the trial level. *People v. Adams* (1989), 131 Ill. 2d 387, 394-96; *People v. Crespo* (1991), 207 Ill. App. 3d 947, 950-51.

At the hearing on the motion to suppress, the State failed to advance any reason why the trial court should uphold the police actions following the initial search if the trial court found that the initial search was improper. Indeed, the State conceded on the record that all of the suppression motions would stand or fall together, *i.e.*, that if the search of defendant's second-floor bedroom was unconstitutional, all later actions involved in the motions to suppress would also be improper. Only the validity of the initial search is properly before this court.

The State maintains that, even if the search of defendant's bedroom was improper, the evidence that the police recovered would inevitably have been discovered anyway. Again, we invoke the waiver rule, in part out of considerations of fairness. By failing to raise the inevitable discovery argument at the trial level or present any evidence directed toward that argument, the State not only prevented the trial court from considering this factual issue but also deprived defendant of a chance to introduce evidence directed at the issue. See *Hux v. Raben* (1967), 38 Ill. 2d 223, 225.

We turn to the principal issue on appeal: whether the trial court erred in holding that Giron lacked either actual or apparent authority to consent to the search of defendant's bedroom. The State has never maintained that the warrantless search can be validated on any ground other than Giron's consent (or apparent consent). On appeal, the State does not challenge the trial court's finding that

Giron lacked sufficient authority over the premises to be able to give *actual* consent to the search. However, on appeal, the State argues that, under *Illinois v. Rodriguez* (1990), 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793, the search was proper because the police reasonably believed that Giron had authority to consent to the search of the premises. We do not agree.

A trial court's decision on a motion to suppress will not be overturned unless that decision is manifestly erroneous. (*People v. Jones* (1993), 245 Ill. App. 3d 302, 306.) On review, this court defers to the trial court's factual findings and decisions about the witnesses' credibility. *People v. Pertz* (1993), 242 Ill. App. 3d 864, 894.

A valid consent search does not always require the consent of the defendant himself. It is sufficient if there is voluntary consent from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. (*United States v. Matlock* (1974), 416 U.S. 164, 171, 39 L. Ed. 2d 242, 250, 94 S. Ct. 988, 993.) Whether a third party possessed such common authority does not depend on technical rules of property, but on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection *** and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 416 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7; see *People v. Daniel* (1992), 238 Ill. App. 3d 19, 34.

In *Rodriguez*, the Supreme Court held that a warrantless search is valid even if the consenting party does not actually possess authority to consent, as long as officers reasonably believe under the circumstances that the third party possesses such authority. (*Rodriguez*, 497 U.S. at 186, 111 L. Ed. 2d at 160, 110 S. Ct. at 2800.) The trial court must apply an objective test, *viz.*, whether the circumstances known to the officers at the time of the entry would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises. *Rodriguez*, 497 U.S. at 188-89, 111 L. Ed. 2d at 161, 110 S. Ct. at 2801.

Without citing any relevant authority beyond *Rodriguez* itself, the State argues that the officers involved here could reasonably have believed that, under the *Matlock* test, Giron had sufficient authority over the premises to consent to the search of defendant's bedroom. The State asserts that immediately before the search the police were aware that Giron, as defendant's housekeeper and baby-

sitter, possessed a key to the house, had the authority to enter the defendant's bedroom for certain purposes, and was the "sole custodian of the house and the child during the day." The State observes that Giron consented to the search because she was concerned about the welfare of K.M., a matter that was entrusted to her care.

Defendant replies that the police could not reasonably have believed that Giron possessed the degree of authority or control over the premises (and, in particular, over defendant's bedroom) that would enable her to provide a valid consent to the search of defendant's home and effects. Defendant notes the uncontroverted testimony that Giron was not a cotenant or resident of the house; that she kept none of her possessions there; that she was there only during the daytime on weekdays; that the police were aware that defendant had restricted her access to certain areas that the police later subjected to the search; that her use of the premises was limited to certain tasks; and that the extent of her access to the house and to the various parts of the house was subject to defendant's wishes.

Because the State has provided us no relevant case authority interpreting either *Rodriguez* or *Matlock* and has made only a cursory argument that Giron had apparent authority to consent to the search, we might well choose to consider the State's argument waived. (See 134 Ill. 2d R. 341(e)(7); *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.* (1987), 118 Ill. 2d 389, 401; *Poplar Grove State Bank v. Powers* (1991), 218 Ill. App. 3d 509, 516-17.) On the merits, we believe that defendant has the better of the argument and that the trial court did not err in holding that Giron lacked apparent authority to consent to the search of defendant's bedroom.

■ The language from *Matlock* we have quoted makes it clear that, for a third party to have actual authority to consent to a search that implicates the fourth amendment rights of a defendant who has an interest in the premises, the third party's degree of control and authority over the premises must, at the very least, not be substantially inferior to that of the defendant. The would-be consenter's right to occupy and use the premises must approximately equal (or exceed) that of the defendant. Thus, for there to be apparent authority to consent to the search, the facts known to the officers must be sufficient to enable them to conclude that the consenter's right to occupy and use the premises at least approximates that of the defendant, such that it can be said that the defendant

has assumed the risk that the third party will allow the search of the common area.

Case law interpreting both *Matlock* and *Rodriguez* bears out the limited scope of a third party's real and apparent authority to consent to a search of premises in which a defendant has an expectation of privacy. In *Rodriguez* itself, the third party was the defendant's girlfriend, who had a key to the defendant's apartment but visited only occasionally, did not pay rent or have her name on the lease, was not allowed to invite guests over on her own, and had moved some of her possessions out of the apartment. The Supreme Court held that, under these facts, the State had not met its burden to establish that the defendant's girlfriend had the common authority over the premises necessary for actual authority per *Matlock*. (*Rodriguez*, 497 U.S. at 181-82, 111 L. Ed. 2d at 156-57, 110 S. Ct. at 2797.) Because the Illinois courts had previously rejected the doctrine of apparent authority, the Court remanded the cause for a determination of whether the officers involved in the case reasonably believed that the defendant's girlfriend had actual authority to allow the challenged entry.

In *People v. Kramer* (1990), 204 Ill. App. 3d 1011, decided several months after *Rodriguez*, this court held that the defendant's landlord lacked either real or apparent authority to consent to the search of defendant's apartment. We relied in part upon *Chapman v. United States* (1961), 365 U.S. 610, 5 L. Ed. 2d 828, 81 S. Ct. 776, which held that a landlord's authority over property occupied by a tenant did not include the power to enter the premises to allow police to search for evidence of a crime. *Chapman*, 365 U.S. at 615-17, 5 L. Ed. 2d at 833-34, 81 S. Ct. at 779-80.

In *People v. Speer* (1989), 184 Ill. App. 3d 730, we held that a social guest of the defendant lacked actual authority to consent to a warrantless entry and search of the defendant's home. We emphasized that the would-be consenter did not live at the apartment and there was no evidence that he was more than a social guest. Thus, he did not have a relationship to the property sufficient to meet the *Matlock* test. *Speer*, 184 Ill. App. 3d at 736.

Somewhat akin to the case at bar is *United States v. Baswell* (8th Cir. 1986), 792 F.2d 755, in which the police searched a house and found incriminating evidence against the defendant, who was a close friend of the owner of the house and had the owner's permission to reside in the house and make free use of it. The police obtained the consent to enter from a paid maintenance and custodial worker who had a key to the house. Although the appellate court

upheld the search on a theory not presented by this case, it held that there was no valid third-party consent under *Matlock*. The court reasoned that, in contrast to the defendant's generally untrammelled access to the house, the custodian's access was at the will of the owner and was for limited purposes, which did not include his own personal benefit. Thus he did not possess the common authority over the premises required by *Matlock*. *Baswell*, 792 F.2d at 759.

Also instructive is *People v. Jacobs* (1987), 43 Cal. 3d 472, 729 P.2d 757, 233 Cal. Rptr. 323, in which the court rejected the State's argument that the police reasonably believed that the defendant's minor daughter, who lived in his house and baby-sat two other children, had the authority to consent to a search of the defendant's house. The court emphasized that "[a]lthough parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given." *Jacobs*, 43 Cal. 3d at 482, 729 P.2d at 763, 233 Cal. Rptr. at 328.

■■ The case at bar turns on the issue of apparent (not actual) authority, but all of the cases we have discussed are instructive. Although the police *may* have been justified in relying on Giron's representations that she had visitors over to the defendant's house (an issue that we need not decide), there is no dispute that, prior to the challenged search, the police officers here were aware that Giron was not a resident or cotenant of the premises, that she did not use the house primarily for her own personal satisfaction, that she had access to the house at the pleasure of the defendant, and that she resided in her own apartment. The trial court did not err in finding that the information available to the police at the time of the search did not enable them to conclude reasonably that defendant had given Giron such authority over the premises that he had assumed the risk that she would consent to the warrantless search that occurred here. Thus, the police did not have reasonable grounds to conclude that Giron could validly consent to the search.

Because the trial court's ruling on the motion to suppress was not manifestly erroneous or legally improper, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.