THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH GARZA, Defendant-Appellant.

First District (3rd Division)   No. 1—94—1217

Opinion filed December 13, 1995.

660

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Kenneth Garza, was convicted of first-degree murder (720 ILCS 5/9—1 (West 1992)) and sentenced to 25 years' imprisonment. On appeal, he asserts that (1) his motion to suppress evidence was improperly denied; (2) improper opinion and character evidence prejudiced him; (3) the State improperly referred to his post-arrest silence and failure to testify; and (4) the State did not prove him guilty beyond a reasonable doubt. For the reasons that follow, we affirm.

On November 15, 1990, Donald Suarez's body was found in an alley at 9228 S. Brandon Street, Chicago. On April 19, 1991, Steven Mireles was charged with the murder after he confessed to committing the murder with Robert Garza, defendant's brother. Two days later, Chicago police officers searched the Garza brothers' apartment pursuant to the consent of the owner.

The following testimony was heard during the hearing on defendant's motion to suppress evidence. Defendant testified that on April 22, 1991, he and his brother Robert had been living on the second floor at 10011 S. Exchange Avenue, Chicago, for four years pursuant to an oral lease with the owner, Gloria Mendiola. They had not paid rent for three months, but had not received an eviction notice or five-day notice nor had Mendiola told them that she wanted them to move.

Chicago police detective John McMurray investigated the murder. After receiving information implicating the Garza brothers in the murder, he tried unsuccessfully to contact them, but did not attempt to get a search warrant for their apartment. On April 22, 1991, Mendiola told McMurray that she rented the apartment to the Garza brothers on a month-to-month basis without any formal lease. She had not received any rent from them since January, but that was not unusual. Neighbors had told Mendiola that the Garza brothers had moved out, but she was unable to gain access to the apartment because they had the only set of keys.

Upon McMurray's request, Mendiola signed a consent-to-search form and the Garzas' next-door neighbor accompanied him into the Garzas' residence. There were some items on the back porch and curtains on the window and back door obstructed the view into the apartment. McMurray admitted that he forced entry by leaning against the back door and popping it open.

According to McMurray, the apartment looked abandoned despite his seeing quite a few belongings in the kitchen. He claimed that he did not notice the food on top of the refrigerator or stove that were visible in the photographic exhibits. In the living room, McMur-

ray saw a stereo, speakers, VCR, television, box of CDs, toboggan, and clothing. There were a lot of clothes in the bedroom, a .25-caliber handgun on the bedroom dresser, and a bullet hole in the bedroom wall.

Realizing that the apartment was still occupied, McMurray left the apartment. The next day, he returned with a search warrant and recovered several items, including the gun, swabs of blood, a .38-caliber bullet from the wall, and photographs.

Defendant's motion to suppress was denied. The trial court found that the police officer acted in good faith in seeking information about the apartment's occupancy and had the right to enter the apartment pursuant to Mendiola's consent.

At trial, the following testimony was heard by the jury. Annie Snead, a 64-year-old woman, testified that she lived at 9224 S. Brandon Street on November 15, 1990. About 6 a.m., she heard six gunshots, then heard a car door slam and a car speed off. A few hours later, she went outside and saw a body in the alley behind the vacant lot next to her house.

Chicago police detective Michael Rowan testified that he began investigating the shooting at 11:30 a.m. on November 15, 1990. Suarez was lying at the side of a large alley. In addition to seeing two holes in Suarez's head, Rowan saw a small amount of blood around his mouth and on his tennis shoes, but saw no blood on the ground near him. Rowan found identification from Michigan and Chicago on the body.

After speaking with several people in the neighborhood, Rowan began looking for a red Toyota pickup truck with a white camper top. He also went to 10011 S. Exchange Avenue to speak with defendant, who was Suarez's cousin. Defendant stated that Suarez had been staying with him since moving from Michigan during the summer. According to defendant, Suarez, who did not have keys to defendant's apartment, left the apartment about 10:30 p.m. the previous evening to see a woman on 92nd Street and did not return.

Rowan learned through a certified copy of the registration that defendant owned a red Toyota pickup truck with a white camper top. In addition, he discovered phone records that indicated that Suarez had called a woman in Michigan from defendant's apartment at 1:57 and 2:27 a.m. on November 15, 1990.

As a result of his investigation, Rowan returned to speak with defendant. When told of the phone calls to Michigan, defendant suggested that Suarez, who had a key to the apartment, may have returned while defendant was asleep. Defendant also told Rowan that he gave Suarez $20 at 10:30 p.m. and that Suarez later returned

to borrow another $18 so that he could buy a bus ticket to Michigan. Defendant related that there was talk on the street that a street gang had killed Suarez because he had cheated them in a $1,000 dope deal.

According to Rowan, defendant claimed that he had not seen Robert since he left for Florida a week before the murder and that a friend, Susan Herrera, from Orlando, Florida, had driven defendant's truck to Florida after she picked it up on the Saturday before the murder.

Steven Mireles testified against defendant in exchange for three years' imprisonment for the concealment of a homicide. He stated that he went to the Garza residence around 8 p.m. on November 14, 1990, where he sat drinking beer on the front porch with Robert, Suarez, Tony Barr, Michael Wigsmore, and Joseph Sansone. He had been friends with the Garza brothers for two years and knew their cousin, Suarez, who was living with them. Around 8:30 p.m., everyone but Mireles and Suarez left. Thirty to forty-five minutes later, Mireles went home and fell asleep while watching television.

He was awakened around 3:30 a.m. by Robert knocking at his back door. Robert told Mireles that he and defendant had badly beaten Suarez because they caught him stealing from the house and weren't sure what to do with him. After Robert indicated he liked Mireles' suggestion that they take him back to Michigan, the two men drove back to the Garza apartment.

There, Robert went into the kitchen with defendant while Mireles sat in the living room. Mireles heard defendant say things like "why were you stealing from us," "we're your cousins," and "we've been taking care of you." Suarez was mumbling. While Robert remained in the kitchen with Suarez, defendant came into the living room and went through a bag of clothes that supposedly belonged to Suarez, separating Suarez's things from those of the Garza brothers. Defendant kept walking around, yelling at Suarez. Once or twice, he went into his bedroom, but Mireles did not know if anyone else was in there.

About an hour after Mireles arrived, defendant gave him Suarez's clothes and told Robert to get Suarez out of the apartment because he did not want to see him anymore. As Mireles, Robert, and Suarez walked downstairs together, Mireles noticed that Suarez had been badly beaten.

Suarez got into the back of the pickup truck; Robert got into the passenger seat; and Mireles drove. When Robert directed Mireles toward Lake Shore Drive, Mireles thought they were going to the expressway or the bus station. Instead, Robert pulled out a .38 re-

volver and directed Mireles to take a right turn at 93rd Street and then into an alley. Robert told him to stop and turn off the headlights, then ordered Suarez out of the truck and onto his knees. Mireles heard a scuffle, then heard Suarez say, "No, Rob, don't." Next came three shots, then two more shots as Suarez tried to run. Robert got back into the truck and told Mireles to go.

Robert and Mireles returned to the Garza apartment around 5:30 or 6 a.m. As Robert paced, defendant asked Mireles if he had seen what happened and what were Suarez's last words. After Mireles told him, defendant sat still and just looked at Mireles. Then, defendant walked around the apartment, talking to Robert in both Spanish and English. Mireles did not know what was being said because he does not understand Spanish.

After making a telephone call, defendant told Mireles and Robert that he had made arrangements for them to stay with his girlfriend, Susan Herrera, in Florida. That morning, Robert and Mireles drove defendant's truck to Orlando, where Robert had the truck painted white.

A couple of weeks later, two detectives came to Herrera's house asking questions about the murder. The next day, Robert flew back to Chicago and Mireles flew back to Chicago a few weeks later. Upon his return, Mireles told Joseph Cisneros, Wigsmore, and Barr what had happened.

Anthony Barr testified that he lived across the street from the Garza brothers on November 14, 1990. That evening, he was on their front porch drinking beer with Robert, Suarez, Cisneros, Wigsmore, and Sansone. He arrived around 7:30 p.m., left around 9 p.m., and returned about 2 a.m. When he returned, Suarez was alone on the porch. Barr had known the Garza brothers for five years and Suarez for about three months.

The next morning, Barr learned that Suarez had been murdered. When he asked defendant about Robert's whereabouts, defendant told him not to worry, it was none of his business. In December 1990, Mireles told Barr that Robert had said that he was going to bring Suarez to Michigan. But on the way, Robert pulled out a gun, told Mireles to stop, got out, and shot Suarez. After the shooting, Mireles and Robert went to Florida.

Cisneros testified that he lived across the alley from the Garza brothers on November 14, 1990. He had known them for five years and Suarez for a couple of months. He described the relationship between the Garza brothers as business-like, not like a big brother-little brother. He said that Robert did whatever defendant told him to do.

On the evening of November 14, 1990, Cisneros was on the Gar-

zas' front porch with Robert, Suarez, Barr, Wigsmore, and Sansone. Erica Torzewski's car was in front of the house. About 9 p.m., everyone but Suarez left the porch. The next morning, Cisneros learned that Suarez had been murdered.

Two weeks later, Cisneros moved into the Garza apartment. At the time, he was selling drugs for defendant, just as Suarez and Robert had done. One day, Cisneros heard defendant on the telephone telling someone that he had a couple of guys take his cousin out of the apartment because he didn't want to see him again. After Mireles returned to Chicago, he warned Cisneros to leave the Garzas' apartment. Mireles related that he and Robert were taking Suarez back to Michigan when, before he knew it, Robert put five shots into Suarez.

According to Cisneros, defendant's girlfriend, Erica Torzewski, was practically living in the Garza apartment in November and December 1990. She moved out before Cisneros moved out in either March or April of 1991.

Detective McMurray testified that he received information in April 1991 that there possibly was a bullet from the murder weapon in the wall at the Garzas' apartment. His testimony was the same as at the hearing on the motion to suppress.

In December 1991, McMurray and his partner went to Torzewski's workplace after learning that she wanted to talk. Torzewski acknowledged that she had information, but was afraid to talk. Every month after that, McMurray and his partner went to see Torzewski. She continued to say that she was afraid until August 1992, when she agreed to talk because there was a rumor she had turned State's evidence and defendant was returning to Chicago to look for her. After speaking with Torzewski, a warrant for defendant's arrest was sent to the Illinois Department of Corrections, where defendant was scheduled to be released from a halfway house.

Torzewski testified that she started dating defendant during the summer of 1990 and knew Robert and Suarez. At that time, defendant was selling cocaine. A couple of weeks before Suarez was killed, defendant had gotten upset and yelled at Suarez about stealing cocaine from him.

On November 14, 1990, Torzewski arrived at defendant's apartment around 2 or 3 p.m. and spent the entire night in his bedroom. She denied any knowledge about telephone calls from her parents' home to defendant's apartment at 9:37 and 10:55 p.m.

Around 8 p.m., Robert, Suarez, Barr, and other guys from the neighborhood were drinking on the front porch. Robert came into defendant's bedroom and said he was going to a party in Indiana. Af-

ter he left, Suarez came and asked defendant for money to go back to Michigan. Defendant said that he had no money and Suarez left. Sometime later, however, defendant became suspicious of everything being so quiet so he left to look for Suarez.

Eventually, defendant, Robert, and Suarez returned to the apartment. Torzewski could hear what was happening because the bedroom door did not close completely. She heard defendant yelling about Suarez stealing defendant's things. For 15 to 20 minutes, Torzewski heard defendant yelling and hitting Suarez, who screamed for him to stop. Defendant told Robert to tie Suarez's hands behind the chair, then continued to yell and hit Suarez for another 15 to 20 minutes. When Suarez asked, "Why don't you just kill me and get it over with?" defendant said something to the effect, "I don't think I should let you go because you might snitch on my operation."

On defendant's orders, Robert left and returned with Mireles. Defendant got his gun from the bedroom, loaded it, gave it to Robert, and told him to put Suarez in the truck, kill him, and dump him behind Loncar's, a restaurant around 92nd Street. After Robert, Mireles, and Suarez left, defendant told Torzewski that he would kill her if she ever said anything, then told her that they would go to Mexico together if anything happened.

After Robert and Mireles returned, Torzewski heard defendant ask what had happened and Robert say that he had killed Suarez. Defendant chuckled when Robert told him that Suarez's last words were, "Don't do it." After Robert returned the gun to defendant, Torzewski heard the two brothers mopping up the bloodstains on the kitchen floor using a mop, bucket, and bleach. The next day, she saw bloodstains by the kitchen sink.

When someone named Alfredo came to the apartment, defendant asked him to take the gun and dump it in the river. After Alfredo left, defendant told Robert and Mireles to go to Florida. He called Susie in Florida and told her that Robert was going to stay with her. Once Robert and Mireles left, defendant returned to the bedroom and again told Torzewski that he would kill her if she said anything about what had happened.

The next day, the police came to the apartment. According to Torzewski, defendant put up a big front and cried, but weeks later, she heard defendant laughing when he talked about Suarez.

Although Torzewski had loaned defendant $2,600 for bail money and had written letters in which she told him she loved him, Torzewski testified that she tried to break up with him in March 1991. She took all her belongings from defendant's apartment, where she had been living, and returned to her parents' home in Indiana, but defen-

dant came and dragged her back to his apartment. Finally, she broke up with him in May 1991 after he was arrested because he was overpossessive, beat her, and threatened her life and those of her family.

Officer Ronald Ferrari of the Chicago police crime lab testified that he recovered a bullet from the Garzas' bedroom wall and swabs from bloodstains on the walls in the bedroom and near the front door. He found no bloodstains in the kitchen.

Officer Richard Chenow, who also worked in the Chicago police crime lab, testified that the four bullets recovered from Suarez's body were fired from the same gun. He was unable to say if the bullet recovered from the bedroom wall was fired from the same gun even though all five bullets were .38 special caliber bullets and were consistent in a number of respects.

Pamela Fish, a serologist in the Chicago police crime lab, testified that Suarez's blood type was A and the swabs of blood from defendant's apartment were human blood type A, but she was unable to determine any further characteristics. Fish stated that 40% of the population has blood type A.

Dr. Stein, who performed the autopsy on Suarez, testified that there were abrasions to the nose and scalp, a bruised left eye and left ear, an incised wound on his forehead, and five gunshot wounds: one behind his left ear, two in his back, one below his left armpit, and one in the back of his head. There were several holes in both lungs, his stomach, pancreas, and intestinal membrane. Four bullets were recovered. Analysis of Suarez's bodily fluids indicated that he was highly intoxicated. According to Stein, the cause of death was multiple gunshot wounds.

After deliberations, the jury found defendant guilty of first-degree murder and the trial court sentenced him to 25 years' imprisonment.

The first issue is whether the trial court erred by denying defendant's motion to suppress evidence. In determining whether Officer McMurray acted reasonably, we must look to the totality of the circumstances confronting him at the time he entered the Garzas' apartment. (*People v. Foskey* (1990), 136 Ill. 2d 66, 75, 554 N.E.2d 192.) We will consider defendant's motion to suppress evidence *de novo* because the testimony is uncontested and the credibility of the witnesses is not questioned, thus presenting a question of law. *People v. Besser* (1995), 273 Ill. App. 3d 164, 652 N.E.2d 454.

■ Whether a warrantless entry is valid when based on the consent of a third party must be decided using an objective standard; that is, whether the facts available to the officer at the time warranted a reasonably cautious person to believe that the consenting

party had authority over the premises. (*Illinois v. Rodriguez* (1990), 497 U.S. 177, 188-89, 111 L. Ed. 2d 148, 161, 110 S. Ct. 2793, 2801; *People v. Mason* (1994), 268 Ill. App. 3d 249, 254, 644 N.E.2d 13.) The consenting party need not actually possess authority to consent as long as the police officer reasonably believes under the circumstances that the third party possesses such authority. (*Rodriguez*, 497 U.S. at 186, 111 L. Ed. 2d at 160, 110 S. Ct. at 2800; *People v. Keith M.* (1993), 255 Ill. App. 3d 1071, 625 N.E.2d 980.) In cases involving ambiguous authority of a third party to consent to a search, any mistakes made by the police officer must be those of a reasonable person, acting on facts leading sensibly to his or her conclusions of probability. *Mason*, 268 Ill. App. 3d at 254.

■ While we find that McMurray had authority to initially enter defendant's apartment, he had no authority to search the apartment. After Officer McMurray was unable to locate either of the Garza brothers, he spoke to Mendiola, who was the building's owner. She told McMurray that the Garza brothers, who rented the apartment on a month-to-month basis, had not paid any rent for the last three months. Mendiola had not seen them and had been told by neighbors that they had moved out. Pursuant to the available information, it was reasonable for McMurray to believe that the apartment had been abandoned and Mendiola had authority to consent to the search. Based on that information, Mendiola signed a consent-to-search form, which placed McMurray in Mendiola's position.

However, that did not automatically give McMurray blanket authority to search the premises. Once McMurray stepped into the apartment and it was obvious that it had not been abandoned, his authority ended. At that point, McMurray should have turned around and left the apartment. Instead, he illegally searched the apartment and eventually found the bullet hole in the bedroom wall, a .25-caliber gun in a bedroom cabinet, and bloodstains on the wall.

Nevertheless, the trial court's error in denying defendant's motion to suppress evidence was harmless because the evidence recovered was not important to defendant's conviction and there was overwhelming independent evidence of defendant's guilt. (*People v. Hobson* (1988), 169 Ill. App. 3d 485, 493, 525 N.E.2d 895.) The bullet in the bedroom wall and the gun were not connected to Suarez's murder and the bloodstains had little relevance.

There was no dispute that the .38-caliber gun that killed Suarez belonged to defendant. Not only did the autopsy reveal that Suarez was killed by multiple gunshots from a .38-caliber gun, but Mireles testified that Robert used a .38-caliber revolver to kill Suarez. Mireles had previously seen defendant with the same gun when he

discharged it in front of his apartment after fireworks one night. Moreover, the police forensics expert could not identify the bullet from the wall as coming from the murder weapon. Based on that testimony, neither the .25-caliber gun nor the .38 bullet recovered from the wall was important to this case.

The blood evidence had little relevance to Suarez's murder even though the bloodstains that were removed from defendant's apartment and Suarez's blood type were both type A. Not only does 40% of the population have type A blood, but there was no dispute that Suarez had been badly beaten in the apartment and murdered elsewhere. For that reason, the bloodstains found in the apartment were not proof of defendant's guilt.

If any of the evidence that had been recovered from defendant's apartment had been important in leading to defendant's conviction, the error would not have been harmless. The police cannot enter an apartment with apparent authority, then close their eyes to signs that the apartment is still occupied. McMurray went through defendant's kitchen, living room, and bedroom, all of which were filled with personal belongings, before he claimed to have realized that the premises had not been abandoned. A reasonably cautious person would have believed that the apartment was occupied as soon as he or she came through the back door. Once it is apparent that the premises are not abandoned, the initial authority ends and the police officer must leave immediately.

■ Defendant's next assertion is that it was improper to allow into evidence opinion and character testimony and the State's closing remarks that Robert did whatever defendant wanted him to do.

Defendant waived this argument because he made no objection to the testimony or closing argument at trial and did not include the trial testimony in his motion for a new trial. (*People v. Williams* (1995), 165 Ill. 2d 51, 60, 649 N.E.2d 397; *People v. Hooper* (1989), 133 Ill. 2d 469, 492, 552 N.E.2d 684; *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) Moreover, his boilerplate reference to the State's closing argument in his motion for a new trial was insufficient to preserve the asserted error. A reference in a post-trial motion to "prejudiced" or "erroneous" statements in closing argument, without factual detail, is not sufficient to preserve the issue for review. *People v. Williams* (1991), 214 Ill. App. 3d 499, 511, 574 N.E.2d 62; *People v. Phillips* (1989), 186 Ill. App. 3d 668, 682, 542 N.E.2d 814.

■ Defendant then argues that the State improperly referred to his post-arrest silence because Detective McMurray testified that defendant said nothing about the murder at the time of his arrest except, "it will all come out in court." We disagree.

McMurray testified about defendant's statement to the police, not his post-arrest silence. While it is well established that a defendant's post-arrest silence cannot be used to create an inference of guilt (*Doyle v. Ohio* (1976), 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245), a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent (*Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182; *People v. Frieberg* (1992), 147 Ill. 2d 326, 353-54, 589 N.E.2d 508). Defendant did not remain silent after being "Mirandized," but spoke to the police about his thriving narcotics trade, which had failed since the murder, and advised the police that the circumstances of the murder would come out at trial. As a result, the State did not elicit improper testimony.

■ Defendant also asserts that, during closing arguments, the State improperly commented on his failure to testify at trial with such remarks as "look at the people you heard from," "you heard no testimony to the contrary," and "testimony was unrebutted." Defendant argues that he was the only person who could have rebutted or contradicted any of the questioned testimony. Furthermore, defendant maintains that the trial court aggravated the error after defense counsel made an objection by saying "the jury has heard all of the evidence. They'll rely on the evidence in reaching their decision. The arguments made by the attorneys [are] not evidence. Proceed."

Defendant has waived this argument because it has not been properly preserved. Defendant objected to only one challenged closing argument remark, which was that "it's unrebutted that it's [defendant's] gun. You heard no testimony to the contrary." (See *Hooper*, 133 Ill. 2d at 492; *People v. Threadgill* (1988), 166 Ill. App. 3d 643, 650, 520 N.E.2d 86.) Moreover, defendant's motion for new trial was inadequate to preserve the issue for appeal. A reference in a post-trial motion to "prejudiced" or "erroneous" statements in closing argument, without factual detail, is not sufficient to preserve the issue for review. *Williams*, 214 Ill. App. 3d at 511; *Phillips*, 186 Ill. App. 3d at 682.

Even if the error had not been waived, the State's closing argument remarks were permissible because they were not calculated to direct the jury's attention to defendant's failure to testify at trial. Furthermore, other witnesses could have testified regarding the challenged evidence. As long as the prosecutor intends to demonstrate the absence of any evidentiary basis for defense counsel's argument and not call attention to the fact that defendant did not testify, he or she may comment on the uncontradicted nature of the State's case, even if the defendant is the only one who could have contradicted it.

(*People v. Herrett* (1990), 137 Ill. 2d 195, 211, 561 N.E.2d 1; *People v. Dixon* (1982), 91 Ill. 2d 346, 350, 438 N.E.2d 180; *People v. Robinson* (1992), 236 Ill. App. 3d 313, 321, 603 N.E.2d 25.) Moreover, the prosecution may properly refer to the fact that a witness' testimony was uncontradicted if it is merely an accurate summary of the evidence. *People v. Johnson* (1992), 239 Ill. App. 3d 1064, 1071, 608 N.E.2d 36.

■ Defendant's final assertion is that he was not proven guilty of first-degree murder beyond a reasonable doubt because his conviction was based on the unbelievable and insufficient testimony of his ex-girlfriend, Erica Torzewski. The issue raised is one of credibility, not accountability. Defendant agrees that if Torzewski were believed, he would be guilty based on the theory of accountability.

After reviewing the entire record, we find that defendant was proven guilty beyond a reasonable doubt. The jury believed Torzewski after hearing all the evidence, including any discrepancies, determined the credibility of all the witnesses, and decided the weight to give their testimony before finding defendant guilty beyond a reasonable doubt. Determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are exclusively within the province of the jury. (*People v. Mullen* (1990), 141 Ill. 2d 394, 403, 566 N.E.2d 222.) Any conflicts in the testimony are to be resolved by the jury. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267.) Viewing the evidence in the light most favorable to the prosecution, as we must, we find that defendant was proven guilty beyond a reasonable doubt because a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261.

Based on the foregoing, we affirm the circuit court judgment.

Affirmed.

GREIMAN, P.J., AND RIZZI, J., concur.