THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DIANE WILLIAMS, Defendant-Appellant.

First District (3rd Division)   No. 1—88—0333

Opinion filed May 15, 1991.

Debra R. Salinger, of State Appellate Defender's Office, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Judy L. De Angelis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant Diane Williams was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and sentenced to 37 years' imprisonment. Her defense at trial was self-defense based on the child sexual assault syndrome. On appeal, defendant argues that (1) the trial court erred in giving the Illinois Pattern Jury Instructions, Criminal, Nos. 7.02, 7.06 (2d ed. 1981) (hereinafter IPI Criminal 2d) for murder and voluntary manslaughter that were found erroneous in *People v. Reddick* (1988), 123 Ill. 2d 184; (2) she was denied a fair trial when the State falsely insinuated that a psychiatrist's evaluation of defendant refuted expert testimony from a psychotherapist; (3) she was denied a fair trial when prior bad acts evidence was improperly admitted to show her propensity to commit acts of misconduct; (4) she was denied a fair trial due to prosecutorial misconduct in the closing argument; and (5) the trial court erred in imposing the sentence of 37 years' imprisonment.

On February 25, 1986, Howard Brown was shot and killed. His adopted daughter, defendant Diane Williams, and her friend, Dale Davis, were indicted for the murder, concealment of a homicidal death, and armed violence. The trial was severed, and the State nol prossed the concealment and armed violence charges before the jury trial began.

Emma and Howard Brown adopted defendant when she was a child. Defendant testified that her father began sexually abusing her when she was young by putting his hands on her vagina and fondling

her. By the time defendant was eight or nine years old, her father would make her lie down and would touch her breasts and her vagina. When defendant was in the eighth grade, her father began having sexual intercourse with her. Defendant further testified that her father performed these sexual acts when her mother was out of town for her job. He never tried anything when her mother was around. Defendant testified that she had told her mother and her aunt about her father's actions, but her mother denied ever being told about any abuse. Defendant's mother testified that she never saw her husband abuse defendant and that defendant was never left alone with her father. Defendant's aunt is now deceased.

Defendant stated that she ran away twice to get out of the house because it hurt too much to stay in the house. In the late 1970's, she left home and moved to Texas, where she met and married Emmett Williams, who was nearly 20 years older than she. Defendant testified that during their seven-year marriage, her husband abused her by hitting her in the head with a telephone, turning a table on her feet, and nailing the house windows shut. Mr. Williams denied ever hurting the defendant. Defendant left Texas and returned to Chicago, occasionally living with her adoptive parents from 1979 through 1986.

Defendant stated that after her mother began going out of town in August 1985, she moved to Kalamazoo, Michigan, to avoid being alone with her father. In September 1985, defendant was badly injured in an automobile accident. After being hospitalized and undergoing surgery, she returned to her parents' home in November 1985. In Chicago, defendant underwent therapy for her leg injury under the care of Dr. Spitz, who testified at trial. When her mother began traveling in January 1986, defendant moved out of her parents' house and went to stay with Gladys Griffin and Earnestine Williams until March 5, 1986, when she was arrested.

During the first week of February 1986, codefendant Davis asked Ms. Griffin to get her a gun. Ms. Griffin arranged for the purchase and gave the gun to Davis. Defendant testified that she sometimes carried the gun because she lived in a violent neighborhood and could not run due to her leg injury.

Defendant testified that she called her mother on the morning of February 26, 1986, to ask if she would be at home because defendant wanted to get her things and show her parents her new used car. Mrs. Brown testified that she received a collect call from defendant at approximately 8 or 8:30 a.m. When she asked defendant where she had been, defendant answered that she had been out of town and had

just returned with her boyfriend. Mrs. Brown told defendant that she had been sick for two weeks and was going to the doctor that day.

Later that morning, Mrs. Brown received another collect call from defendant at approximately 10:30 a.m. Defendant offered Mrs. Brown a ride to the clinic, then asked what time she was going to the clinic and when she would be home. Mrs. Brown told defendant that she would be leaving in a few minutes with a friend who was driving her, and asked defendant to clean the kitchen when she came over. Mr. Brown was in the apartment at the time.

Defendant testified that she and codefendant Davis went to her parents' home and drove down the alley three or four times. When defendant got to the apartment, only her father was home. Her father told her to go to the clinic to pick up her mother, which she did. Defendant arrived at the Mercy Hospital clinic at approximately 1 p.m. and told Mrs. Brown, "Daddy told me to come and pick you up." After telling defendant that she already had a ride, Mrs. Brown gave defendant $2 for gas. When Mrs. Brown again told the defendant to go home and do the dishes, defendant left.

Defendant went back to her parents' apartment. Defendant stated that she told codefendant Davis that she was not going to do any dishes, but was going to get her things and leave as quickly as possible. Davis waited in the car while defendant went inside. Initially, defendant was locked out of the building, and the landlord's niece, Eloise Lee, let her into the building. Mrs. Lee testified that defendant did not look unusual for someone who was locked out, and did not appear nervous, upset, or distraught.

Defendant further testified that when she entered the apartment, her father began arguing with her about missing pots and pans. She stated that she begged her father to leave her alone, but he grabbed her and pushed her against the wall. Defendant stated that her father was ready to fight, which usually meant he was going to "try something else." She said that she was afraid that he was going to sexually assault her. When her father said, "It had been a long time," defendant believed that her father was going to hurt her. She told him to leave her alone. After he turned off the water in the kitchen, defendant took out the gun she was carrying, closed her eyes, and pulled the trigger, hitting her father twice in the back.

When her father did not move, defendant panicked and ran downstairs to get Davis. After defendant told Davis she did not know what to do, the two women went upstairs, put plastic bags over Mr. Brown's body, and dragged him into the front closet. Defendant testified that she was too scared to call the police because she thought her

father was already dead. Defendant also testified that she had never before fired a gun. According to police, defendant made a statement that she and Davis displaced items in the apartment and broke the back door window to make it look like a burglary. After leaving the apartment, defendant and Davis went to Griffin's house, where defendant gave the gun to Griffin and told her to put it away. Griffin placed the gun in her purse in a closet.

Mrs. Lee stated that she saw defendant come downstairs one-half hour after she arrived. Defendant did not appear nervous or injured, nor was she crying. She did not make any complaints about her father. Mrs. Lee then saw defendant and another person walk upstairs. At that time, defendant was not using a cane or crutches.

After being treated by the doctor, Mrs. Brown returned home around 3 or 3:30 p.m. She walked up the back stairs to her third-floor apartment, where she noticed the door cracked, the gate across the door, and her dog not barking. After seeing glass on the back porch floor, Mrs. Brown went down to the first-floor apartment and called the police. When the police arrived, Mrs. Brown told them what she saw and accompanied them to her apartment. When the police officers discovered Mr. Brown's body in a plastic bag in the front closet, they told Mrs. Brown to leave the apartment. When she returned later, Mrs. Brown noticed that various items were in disarray or missing.

Police officer Frank Ford testified that around 4 p.m. on February 25, 1986, he went to the crime scene. He met Mrs. Brown, who told him that she thought her apartment had been burglarized. Officer Ford noticed that the kitchen door was slightly ajar, the lower left window pane of the kitchen door had been broken, and glass lay on the outside porch. While searching the apartment, Mrs. Brown opened a closet door and an object in a plastic bag fell out. Recognizing the object as a body, Ford asked his partner to take Mrs. Brown out of the apartment while he performed CPR on the warm body. After the paramedic team came and attempted to revive the victim, the officer secured the apartment.

Detective Albert Wolff testified that on March 5, 1986, he went to Ms. Griffin's apartment, searched it, and arrested the defendant and codefendant. At the police station, the defendant admitted shooting her father, but stated that she did so because she was afraid of him.

At trial, Judith Roth, a psychotherapist, testified that she examined the defendant six times between December 1986 and June 1987. It was her opinion that the defendant was suffering from child sexual abuse syndrome. Ms. Roth testified that the defendant is affected by

the same type of things that post-traumatic stress disorder consists of, including: (1) a recognized stressor; (2) flashbacks or dreams; (3) a noticed detachment from the world; and (4) at least two of the following: hyperalertness, sleep disturbances, survivor guilt, memory impairment, avoidance of feelings, and intensification when exposed to similar trauma. Ms. Roth also testified that defendant suffers from child sexual abuse syndrome, which consists of (1) a sense of helplessness; (2) secrecy around the event; (3) an accommodation to the event; (4) delayed or conflicted disclosure about the event; and (5) retraction of that disclosure. Ms. Roth believed that the defendant was not faking her claim that she was sexually abused by her father during her childhood.

On cross-examination, the State asked Ms. Roth whether Dr. Stipes at the Psychiatric Institute had examined defendant. Defense counsel objected, arguing irrelevance in a sidebar. The court overruled the objection, and Ms. Roth stated that defendant did not see Dr. Stipes, and that Ms. Roth did not consult with Dr. Stipes. Ms. Roth also testified that defendant was never submitted to psychological testing prior to Ms. Roth's evaluation. On redirect examination, Roth testified that no one at the Psychiatric Institute was qualified to do child sexual abuse evaluations.

In rebuttal, the State presented the testimony of Emmett Williams, defendant's ex-husband. Mr. Williams testified that he had seen defendant shoot a .357 magnum gun and a .22 caliber revolver, and handle a sawed-off shotgun. He further stated that defendant had shot through a door at a man who was repossessing their television.

After closing arguments, the court instructed the jury, including giving the IPI instructions for murder and voluntary manslaughter. The jury returned a guilty verdict. Defendant's motion for a new trial was denied.

At the sentencing hearing, Sister Evelyn Sommers, Deputy Sheriff Roger Watson, and Superintendent Debra Hopkins testified on defendant's behalf. Defendant expressed her sorrow at what had happened. Following argument, the trial court sentenced defendant to 37 years' imprisonment.

Defendant asserts that she must be given a new trial because the IPI instructions for murder (IPI Criminal 2d No. 7.02) and voluntary manslaughter/unreasonable belief in justification (IPI Criminal 2d No. 7.06) given at her trial were deficient. The trial court instructed the jury:

"To sustain the charge of murder, the State must prove the following propositions:

1. That the defendant performed the acts which caused the death of Howard Brown; and

2. That when the defendant did so, she intended to kill or do great bodily harm to Howard Brown; or she knew that her act would cause death or great bodily harm to Howard Brown; or she knew that her acts created a strong probability of death or great bodily harm to Howard Brown; and

3. She was not justified in using the force which she used." See IPI Criminal 2d No. 7.02.

"To sustain the charge of voluntary manslaughter, the State must prove the following propositions:

1. That the defendant performed the acts which caused the death of Howard Brown; and

2. That when defendant did so, she intended to kill or do greatly bodily harm to Howard Brown; or she knew that her act would cause death or great bodily harm to Howard Brown; or she knew that her acts created a strong probability of death or great bodily harm to Howard Brown; and

3. That when the defendant did so she believed that circumstances existed which would have justified killing Howard Brown;

4. That the defendant's belief that such circumstances existed was unreasonable." See IPI Criminal 2d No. 7.06.

■■ The Illinois Supreme Court in *People v. Reddick* (1988), 123 Ill. 2d 184, held that tendering these IPI murder and voluntary manslaughter instructions together was grave error because they incorrectly set forth the State's burden of proof regarding the mental state necessary to reduce a murder charge to voluntary manslaughter. (123 Ill. 2d at 197-99.) Under the statute effective at the time of the trial, once the defendant presented some evidence that would reduce a murder charge to voluntary manslaughter, the State had the burden of proving beyond a reasonable doubt that those defenses were meritless as well as proving beyond a reasonable doubt the statutory elements of murder. (*Reddick*, 123 Ill. 2d at 197.) When those murder and voluntary manslaughter instructions are read together, however, they fail to inform the jury that the State has the burden of disproving the mitigating mental states necessary to reduce murder to manslaughter. (*People v. Fercsi* (1989), 182 Ill. App. 3d 13, 15.) Consequently, if the State does not prove beyond a reasonable doubt that the defendant had an unreasonable belief in justification for her actions, the jury is precluded from convicting the defendant of voluntary manslaughter. *Reddick*, 123 Ill. 2d at 194-95.

■ Although the State concedes that *Reddick* is applicable in this case, it argues that the instructional error was harmless because no voluntary manslaughter instruction should have been given. The State, however, did not object at trial. For a voluntary manslaughter instruction to be given, there must be some evidence at trial, if believed by the jury, that would reduce the crime of murder to manslaughter. (*People v. Austin* (1989), 133 Ill. 2d 118, 124-25.) A *Reddick* instructional error can be harmless if the defendant fails to present sufficient evidence to justify instructions on voluntary manslaughter. (*People v. Riggins* (1990), 205 Ill. App. 3d 904, 912.) An error that affects the constitutional right to a fair trial must be harmless beyond a reasonable doubt (*People v. Fierer* (1988), 124 Ill. 2d 176, 187); that is, there must be no reasonable possibility that the error might have contributed to the conviction. *People v. Fields* (1988), 170 Ill. App. 3d 1, 13.

Defendant relies on *Falconer v. Lane* (7th Cir. 1990), 905 F.2d 1129, 1137, which granted a new trial in the Illinois State court because the incorrect *Reddick* instructions were given. The Federal court rejected the State's argument that the error was harmless because there was sufficient evidence to support the jury's verdict of murder instead of voluntary manslaughter. The *Falconer* court stated:

> "The central point is that the jury might have decided to convict the petitioner of murder because the State proved that she intentionally killed another without a reasonable belief that she acted in self defense—despite clear proof that the petitioner *** held an unreasonable belief that she was justified in killing the victim." 905 F.2d at 1136.

Defendant further relies on *People v. Stewart* (1986), 143 Ill. App. 3d 933, 935, which held that it was error not to give voluntary manslaughter instructions based on the defendant's version of the occurrence. The court stated that as long as there was slight evidence showing the defendant's subjective belief that use of force was necessary, the voluntary manslaughter instruction is to be given. (*Stewart*, 143 Ill. App. 3d at 935.) The only evidence that the defendant acted in self-defense came from the defendant, while all the other eyewitnesses testified that the defendant was the aggressor. Nevertheless, the court concluded that it was for the jury to decide whether the defendant had a subjective belief, and if so, whether that belief was reasonable or unreasonable. *Stewart*, 143 Ill. App. 3d at 935.

All the cases the State cites to support its contention that the instruction error was harmless are distinguishable. *People v. Thomas* (1989), 185 Ill. App. 3d 1050, actually supports the defendant's argu-

ment. The *Thomas* court reversed and remanded the case due to incorrect *Reddick* instructions, holding that there was enough evidence presented by the defendant to tender the voluntary manslaughter instructions even though the defendant's testimony was contradicted by all the other witnesses. The court stated that the defendant's testimony that he heard shots coming from the victim's direction was enough to allow the jury to consider voluntary manslaughter. *Thomas*, 185 Ill. App. 3d at 1054.

The State's reliance on *People v. Harris* (1989), 132 Ill. 2d 366, *Austin* (133 Ill. 2d 118), and *Fierer* (124 Ill. 2d 176) is misplaced. None of these cases involved incorrect *Reddick* instructions. There was a hybrid instruction unlike the *Reddick* instructions given in *Harris* (132 Ill. 2d at 395), and guilty but mentally ill instructions misstating the statute given in *Fierer*. (*Fierer*, 124 Ill. 2d at 186.) The *Fierer* court also concluded that the error was not harmless since the incorrect instruction might have affected the outcome. (124 Ill. 2d at 187-88.) In *Austin*, the trial court's refusal to tender a voluntary manslaughter/provocation instruction was ruled proper since there was no evidence presented of mutual combat. *Austin*, 133 Ill. 2d at 124.

The State also cites *People v. Foster* (1987), 119 Ill. 2d 69, 88, and *People v. Ward* (1984), 101 Ill. 2d 443, 451, where evidence was insufficient for an involuntary manslaughter/recklessness instruction. In *Foster*, the defense argued that the defendant's behavior was reckless and unintentional because he was intoxicated and drugged at the time of the killing. The defendant's own testimony, however, was that he deliberately struck the victim with a baseball bat numerous times on the head and the rest of her body. (*Foster*, 119 Ill. 2d at 88.) The court ruled that a witness' observation that the defendant looked "high" was insufficient to tender an involuntary manslaughter instruction. (*Foster*, 119 Ill. 2d at 88.) In *Ward*, the supreme court stated that the defendant denied beating the victim to death and did not present any evidence of recklessness. *Ward*, 101 Ill. 2d at 451.

In *People v. Daniel* (1989), 191 Ill. App. 3d 837, the court ruled that, even though *Reddick* instructions were erroneously given, the error was harmless since the State overwhelmingly proved the defendant guilty of murder. In his sworn custodial statement, which was introduced into evidence, the defendant stated that he shot into the car after one of the passengers in the car used a gang slogan and may have pointed something at him. He thought the victim would have a gun since he was a Gangster Disciple even though he never saw a gun. A witness, who also never saw a gun, made a custodial

statement to the assistant State's Attorney that the defendant reached for his gun and fired two shots into the car after one of the passengers used a gang slogan. There was no testimony that the person who was killed either had a gun or posed any threat to defendant. *Daniel*, 191 Ill. App. 3d at 848.

■ Here, the erroneous instructions given at trial were not harmless beyond a reasonable doubt since the defendant presented sufficient evidence that warranted a voluntary manslaughter instruction. Defendant testified that her father had sexually abused her since she was a young child, that he began having sexual intercourse with her when she was in the eighth grade, and that before she shot her father, his actions led her to believe it was necessary to defend herself against criminal sexual assault. Further, the expert witness, psychotherapist Judith Roth, testified that it was her opinion that defendant suffered from child sexual abuse syndrome, which is associated with post-traumatic stress syndrome. Ms. Roth stated that, given the syndrome, the victim's actions could have caused a flashback, leading defendant to believe self-defense was justified.

■ The State's argument that any instructional error was caused by defendant is without merit. In *Reddick*, not only did the defendants not object to the instruction or include it in their post-trial motions, but one of the defendants did not even raise the issue in his appeal. (*Reddick*, 123 Ill. 2d at 198.) The Illinois Supreme Court rejected the waiver argument, stating that burden of proof and elements of the offense instructions are essential to a fair trial. Failure to give such instructions constituted grave error when the jury was not apprised of the State's burden of proof. *Reddick*, 123 Ill. 2d at 198.

The court in *Fercsi* stated that the defendant could not waive a right that he did not know he had. (*Fercsi*, 182 Ill. App. 3d at 16.) Because that trial occurred before the *Reddick* decision, the defendant did not know at the time the instructions were tendered that the Illinois Supreme Court would later find that the instructions were improper. *Fercsi*, 182 Ill. App. 3d at 15.

■ We reject the State's argument that *Reddick* should not be applied retroactively because it is based on statutory interpretation rather than on constitutional principles. The Illinois Supreme Court has granted leave to appeal in a number of cases which raise the issue of whether *Reddick* should be applied retroactively or prospectively. There have been no decisions to date on these cases. (*E.g., People v. Shields* (1989), 181 Ill. App. 3d 260; *Fercsi*, 182 Ill. App. 3d 13.) The First District Appellate Court, however, has found *Reddick* to apply retroactively in direct appeals. (*People v. Brooks* (1988), 175 Ill. App.

3d 136; *Shields*, 181 Ill. App. 3d 260; *Fercsi*, 182 Ill. App. 3d 13; *Thomas*, 185 Ill. App. 3d 1050.) We follow this precedent.

■■ Since the incorrect *Reddick* instructions given constituted grave error and were not harmless beyond a reasonable doubt, the defendant's murder conviction is reversed and this cause remanded for a new trial. Defendant raises a number of other issues on appeal. We will address the remaining issues insofar as they are likely to recur after remand.

Defendant asserts that she was denied a fair trial because the State improperly cross-examined the expert witness. To support the self-defense theory that defendant was suffering from post-traumatic stress disorder when she shot her father, psychotherapist Judith Roth testified as an expert. When the State asked Ms. Roth during cross-examination whether she knew that defendant was examined by psychiatrist Dr. Stipes of the Psychiatric Institute, defense counsel objected.

In a sidebar, defense counsel argued irrelevance because Dr. Stipes never examined the defendant for child sexual assault syndrome, but merely to determine her fitness to stand trial. In addition, there was no one qualified at the Psychiatric Institute to evaluate child sexual abuse cases. The State responded that it was attempting to discredit Ms. Roth's testimony by showing that she did not consult with any other doctors who had evaluated defendant. The objection was overruled, and Ms. Roth testified that she did not know of Dr. Stipes' examination of defendant. On redirect, Ms. Roth testified that the Psychiatric Institute did not have any personnel who could evaluate child sexual abuse cases.

Defendant asserts that the clear implication of the State's questioning was to impeach Roth by insinuating that a board-certified medical doctor found nothing wrong with defendant. Because Ms. Roth's testimony was critical to the post traumatic stress defense, defendant claims that the State's cross-examination denied her right to a fair trial. The State contends that the cross-examination of Ms. Roth was proper because it was intended to discredit her testimony by showing that her investigation of defendant's mental state was based on poor and incomplete investigative procedures.

■■■ The scope of cross-examination is largely within the discretion of the trial court, and its rulings will not be overturned unless an abuse of discretion results in manifest prejudice to the defendant. (*People v. Evans* (1988), 173 Ill. App. 3d 186, 203.) An expert can be cross-examined for the purpose of explaining, modifying, or discrediting the expert's testimony. (*Fields*, 170 Ill. App. 3d at 14.) An expert

may also be cross-examined to determine which factors were taken into consideration and which ones disregarded in arriving at the conclusion. (*Fields*, 170 Ill. App. 3d at 14.) Therefore, the trial court did not abuse its discretion in allowing the cross-examination of Ms. Roth.

■ The State's use in closing argument of the expert's testimony regarding Dr. Stipes is more troublesome. There, the State commented that defendant had seen a psychiatrist from the Psychiatric Institute and "everything checked out" and that she was found fit and sane. Improper use during closing argument of evidence that was introduced for a limited purpose can be deemed reversible error. (*Fields*, 170 Ill. App. 3d at 15.) The State's comments, however, although improper, were not enough to be reversible error.

■ Defendant also claims that she was denied a fair trial by the cumulative effect of the State's comments during closing argument regarding defense counsel's actions and her testimony. Taken as a whole, however, the State's comments did not accuse the defense counsel of fabricating a defense or improperly coaching the defendant's testimony. Therefore, they were not improper.

■ Defendant waived her argument that the State's comments during closing argument improperly aroused the sympathy of the jury by focusing on Mr. Brown's memory being defiled and Mrs. Brown's horror and terror. There was neither an objection made nor a specific reference in the post-trial motion to these comments. A reference in a post-trial motion to "prejudiced" or "erroneous" statements in closing argument, without factual detail, is not sufficient to preserve the issue for review. *People v. Phillips* (1989), 186 Ill. App. 3d 668, 682.

■ Defendant also waived her argument that the trial court improperly allowed rebuttal testimony that showed defendant's propensity to commit acts of misconduct. No objection was made at trial and the issue was not included in the motion for a new trial. Since we have reversed the conviction and ordered a new trial in this cause, we will not address the sentencing issues.

Reversed and remanded.

WHITE and RIZZI, JJ., concur.