THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSHUA FIERER, Defendant-Appellant.

Third District    No. 3—92—0486

Opinion filed March 4, 1994.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Erik I. Blanc, State's Attorney, of Pekin (John X. Breslin and Terry A.

Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE SLATER delivered the opinion of the court:

The defendant, Joshua Fierer, was charged with murdering his wife, Mary Fierer. At the conclusion of defendant's first trial, he was found guilty but mentally ill of murder and he was sentenced to a term of 30 years' imprisonment. The defendant appealed and this court reversed his conviction and remanded the cause for a new trial. (*People v. Fierer* (1987), 151 Ill. App. 3d 649, 503 N.E.2d 594.) The Illinois Supreme Court subsequently affirmed our decision. (*People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.) Following defendant's second trial, the jury found the defendant guilty of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and he was sentenced to a term of 10 years' imprisonment. The defendant now appeals, contending that: (1) he proved by a preponderance of the evidence that he was insane at the time he killed his wife; (2) he was denied a fair trial by improper cross-examination of his expert witnesses; (3) the jury was improperly instructed; (4) the trial court erred in limiting defense counsel's cross-examination of a prosecution witness; and (5) he was denied a fair trial by improper closing arguments by the prosecutors. We affirm.

Peoria attorney John Brady testified that he had been appointed guardian *ad litem* for the children of Joshua and Mary Fierer in connection with the Fierers' divorce proceedings. On the morning of December 6, 1984, he met with the defendant and Mary at the family residence in Morton, Illinois, to supervise the division of property. At the time, Mary and two of the children were living elsewhere in Morton. According to Brady, matters proceeded fairly smoothly from about 9 a.m. to 10:50 a.m. Both of the Fierers appeared somewhat ill at ease but were generally cooperative. During the course of the morning, Brady and the Fierers were joined by two professional movers. Shortly before 11 a.m., Mary went home to get more boxes and to transport some fragile items which she did not want the movers to handle. She returned after about 20 or 30 minutes.

At approximately 11:40 a.m., Brady telephoned his office, using the kitchen telephone while standing in the adjoining family room. The movers were outside and the Fierers were cleaning out the closet in a bedroom down the hall from the kitchen. While on the phone, Brady noticed defendant in the kitchen and then saw defendant leave the kitchen carrying a plastic trash bag. Within a minute or so thereafter, Brady heard a commotion coming from the bedroom, as if items

had fallen down in the closet. He then heard Mary calling for help in a loud, excited voice.

Brady dropped the telephone and ran into the bedroom. He saw defendant on the floor near the closet with his elbows extended perpendicular to his body and they were moving very rapidly. Eventually realizing that defendant was attacking his wife, Brady, who is 6 feet 7 inches tall, tried to pull the defendant away, but he was unable to do so. Brady then ran to the front door and yelled to the movers for help. He returned to the bedroom and tried to pull defendant away by the shoulders but was again unsuccessful. Brady then took a case containing phonograph records and hit defendant on the head with it. When this had no effect, Brady left the room and called the police.

The movers, Keith Mordue and William Vogel, Jr., testified that they were outside in the truck when they heard a woman's screams coming from inside the house. Brady then came outside and told them, "He is killing her." Mordue ran into the bedroom and saw Mary Fierer leaning against the back of the closet and defendant leaning against her and stabbing her. Mordue tried to pull defendant away by his belt but he could not do so. Defendant did not say anything or even seem to realize that anyone else was present. Mordue then got a baseball bat from Vogel and returned to the bedroom with Vogel. They saw Mary on the ground with her head in the closet and her legs outside the closet and the defendant on top of her. Mordue told defendant to stop but he did not respond. Mordue then raised the bat over his head and brought it down hard onto defendant's right shoulder or collar bone. Defendant did not cry out in pain or grab his shoulder. He merely turned and stared at Mordue. As Mordue ran out of the room, he shouted that the police had arrived, but this also had no effect on the defendant. The movers then left the house to contact the police.

Morton police officers Mart Tatum and David Frank testified that they were the first policemen at the scene. They found defendant lying on top of his wife's body. They asked the defendant to get up but he did not move. The officers helped defendant to his feet and took him into the hallway. Defendant was told to lie down on his stomach and he did so. Defendant was asked his name but did not respond, nor did he respond to any other questions.

Dr. Grant Johnson testified that he performed the autopsy on Mary Fierer. A knife was embedded in her left chest and her body showed numerous stab wounds. She died from internal and external hemorrhaging resulting from the various wounds.

After the State rested, the defense called Daron Ray Perry, who

testified that he was a member of the ambulance crew which reported to the Fierer residence on December 6, 1984. The defendant was disoriented and he did not respond to questions or to painful stimuli, nor did he react when an I.V. was inserted. Once inside the ambulance, defendant began saying, over and over in a high, squeaky voice, "Mary don't. My hands are cut. Mary, you stabbed me." Ambulance personnel Thomas Eaton and Robert Cloyd testified in rebuttal that defendant moved his head and eyes in response to words and sounds made in the ambulance. Eaton confirmed, however, that defendant kept repeating during the ride to the hospital, "Mary, don't do it. Put the knife down. Mary, please don't. My hand is cut, don't stab me, Mary."

Dr. Richard Corley, a plastic and reconstructive surgeon, testified that he treated the defendant in the emergency room of St. Francis Hospital. When Corley first saw defendant he was moaning and incoherent. Defendant had incurred 34 wounds to his hands and fingers. In Corley's opinion, those wounds were defensive wounds suffered when defendant attempted to grab the blade of a knife being thrust towards him. When Corley asked the defendant how he had been injured, he told Corley that his wife had attacked him with a knife, he had attempted to take the knife away from her, and the next thing he remembered was waking up in the emergency room.

Dr. Phillip Immesoete and Dr. John Feegel agreed with Dr. Corley that defendant's wounds were more likely defensive wounds incurred while attempting to ward off the knife rather than slippage wounds incurred while using the knife. Dr. Edmund Donoghue testified in rebuttal that defendant's wounds were more likely due to slippage than self-defense, while the wounds on Mary Fierer's hands were defensive. Donoghue acknowledged, however, that defendant's wounds could be defensive or slippage or a combination of both.

Defendant Joshua Fierer, 47 years old at the time of the incident and 54 years old at the time of the second trial, testified that he and his wife were married in 1959. Defendant graduated from medical school in 1963, and at the time of the incident, he was chairman of the pathology department of the University of Illinois Medical School in Peoria, a position he had held since 1978. Defendant and his wife had four children.

Defendant testified that, although Mary had a troubled childhood during which she was hospitalized and received electroshock and psychotherapy after slashing her wrist and arm with a razor blade, she was a good wife and mother and they had a happy marriage up until her mother's death in 1981. Prior to that time, Mary was very supportive of defendant in his work, helped him entertain fellow fac-

ulty and students, and played the primary role in running the household and raising the children. After her mother's death, Mary became distant and took less interest in the children and the household. She began drinking and twice in 1983 had to be hospitalized after overdosing on pills and alcohol. She went to work selling household items for Exclusive Home Products and she told defendant that she was making numerous sales, but he later learned that she never made any legitimate sales and that she had falsified orders to make it look as if she had. Mary told defendant that she had to travel to Springfield and Indianapolis on business but he later learned that she went to those cities to meet with the couple's former rabbi, with whom Mary was having an affair. Defendant also learned that Mary had rented a house in Peoria where she and the rabbi sometimes spent the night. Defendant also testified that Mary converted funds intended for the children's trust accounts to her own use.

As a result of their problems, the Fierers saw two marriage counselors and a psychiatrist but Mary eventually refused to participate further. In addition to his marital problems, defendant experienced pressures at work because the medical school was undergoing reorganization and there was a possibility defendant could lose his job. Defendant became very depressed and had difficulty concentrating and sleeping. The head of the psychiatry department at the medical school began treating defendant for depression and prescribed medication which defendant took on a daily basis up to and including December 6, 1984.

In January of 1984, defendant filed for divorce at Mary's suggestion. Initially, they used the same lawyer but Mary subsequently hired her own lawyer and the proceedings became bitter. In June, Mary obtained an *ex parte* order prohibiting defendant from entering the family home. The order was later rescinded and it was agreed that Mary would move out of the house and that the two youngest children would live with her. Defendant subsequently learned that, contrary to her promise to continue to raise the youngest children in the Jewish faith, Mary was taking them to a Christian church.

Defendant further testified that on December 6, 1984, he met with John Brady and Mary at the family home for the purpose of dividing property belonging to the Fierers and their children. Around 10:15 a.m., Mary left to get some more boxes, returning about 11:30. Mary resumed sorting items from a bedroom closet and when defendant entered the bedroom, Mary asked him to get a plastic garbage bag from the kitchen. Defendant returned to find Mary kneeling at the entrance to the closet and he knelt next to her and handed her

the bag. Defendant then saw Mary thrusting a knife toward his chest. He put up his left hand to block the knife and was cut. He then grabbed the blade of the knife with his right hand. The next thing he recalled was being in the hospital emergency room. He did not remember stabbing Mary or being arrested by the police.

The final testimony at trial came from three psychiatrists. Dr. Thomas Tourlentes and Dr. James Ward testified for the defense, and Dr. Robert Chapman testified in rebuttal for the prosecution. Dr. Tourlentes testified that he examined the defendant in July of 1985. In his opinion, at the time of the incident, defendant was distraught and in a state of turmoil. Defendant was suffering from severe depression which amounted to a mental disease or defect. As a result of that depression, defendant was unable to conform his conduct to the requirements of the law and was unable to appreciate the criminality of his conduct.

On cross-examination, Tourlentes acknowledged that he had testified at the first trial that defendant had suffered from both depression and isolated explosive disorder, a mental disorder listed and described in the Diagnostic and Statistical Manual of Mental Disorders III (hereinafter "DSM III"). Over defendant's objection, Tourlentes acknowledged that the revised edition of DSM III (hereinafter DSM-III-R) no longer listed isolated explosive disorder as a mental disorder because of the high potential for misdiagnosis. On redirect examination, Tourlentes testified that in retrospect, the label "intermittent explosive disorder," a diagnosis which was retained in DSM-III-R, probably better described defendant's condition at the time of the incident.

Dr. Ward testified that he treated the defendant at St. Francis Hospital from December 14, 1984, until his discharge on January 8, 1985, and thereafter. In Ward's opinion, at the time of the incident, defendant was suffering from depression and isolated explosive disorder—a single, discrete episode of violence, grossly out of proportion to any precipitating factor, resulting from the failure to resist an impulse. According to Ward, defendant could not conform his conduct to the requirements of the law. Ward, like Tourlentes, acknowledged that isolated explosive disorder was omitted from DSM-III-R. Ward stated that if that diagnosis had not been available when he evaluated defendant in 1985, he would have probably used the label "atypical impulse control disorder" to describe defendant's condition.

Dr. Ward was cross-examined concerning whether he had previously diagnosed a man named Ronald Uppole as insane and whether Uppole later claimed that he was faking insanity. Defense counsel then made a motion for a mistrial which was denied, but the court instructed the jury to disregard the prosecutor's question.

Dr. Chapman testified that he examined the defendant in August of 1985. According to Chapman, defendant suffered from chronic depression which may have contributed to but did not account for or cause his conduct on December 6, 1984. Defendant did not suffer from a mental disease or defect or any other condition that caused him to lack the capacity to control his behavior or conform his conduct to the requirements of the law. Chapman did not agree that defendant suffered from isolated explosive disorder or impulse control disorder.

Following closing arguments and deliberations, the jury returned a verdict of guilty of voluntary manslaughter. Defendant's post-trial motion was denied and this appeal followed.

The defendant first contends that he proved by a preponderance of the evidence that he was insane at the time he killed his wife. Defendant argues that the testimony of the witnesses who observed defendant during and shortly after the incident demonstrates that he was in an unreasoning, trance-like state. Defendant notes the unsuccessful attempts to stop him from attacking his wife, which included the use of considerable force, his unresponsiveness to questions and painful stimuli after the incident, and his statements in the ambulance in which he appeared to be reliving the incident. Defendant also points out that the incident occurred while others were nearby, which indicated that his actions were unplanned and spontaneous because he could not avoid detection or flee. Defendant further maintains that the testimony of the defense experts regarding defendant's sanity was more credible than that of the State's expert.

When a defendant raises the affirmative defense of insanity he bears the burden of proving by the preponderance of the evidence that he was legally insane at the time of the offense. (*People v. Thurman* (1991), 223 Ill. App. 3d 196, 584 N.E.2d 1069; Ill. Rev. Stat. 1985, ch. 38, par. 6—3(e).) The fact that a defendant engaged in unusual behavior (see, *e.g.*, *People v. Beehn* (1990), 205 Ill. App. 3d 533, 563 N.E.2d 1207) or made bizarre or delusional statements (see *Thurman*, 223 Ill. App. 3d 196, 584 N.E.2d 1069) does not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane (compare Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a) with Ill. Rev. Stat. 1985, ch. 38, par. 6—2(d)). Where the opinions of expert witnesses conflict, the trier of fact may accept one expert's opinion over another. (*People v. Williams* (1990), 201 Ill. App. 3d 207, 558 N.E.2d 1258.) The issue of sanity is a question of fact, and a jury's finding on that issue will not be disturbed unless it is contrary to the manifest weight of the evidence. *Thurman*, 223 Ill. App. 3d 196, 584 N.E.2d 1069.

■ While the testimony of the witnesses concerning the incident and defendant's condition afterward certainly *suggest that defendant* was acting abnormally, we do not believe that the only reasonable conclusion from the evidence was that defendant was insane. In Dr. Chapman's opinion, after defendant began stabbing his wife, he lapsed into autonomous behavior accompanied by a disassociated mental state, the essential features of which were a sudden, temporary alteration in the normal integrative function of consciousness and behavior. As Chapman explained, this behavior is similar to a man slapping his wife or girlfriend once or twice and then lapsing into a state where he automatically continues the beating until he becomes exhausted. Chapman also testified that after the incident defendant experienced post-traumatic stress syndrome resulting in "emotional anesthesia" and nonresponsiveness. Despite these conditions, however, Chapman did not believe that defendant was suffering a mental disease or defect that caused him to lack the capacity to control his behavior or conform his conduct to the requirements of the law. Although Dr. Tourlentes and Dr. Ward disagreed, their credibility may have been weakened by their initial diagnosis of isolated explosive disorder and the subsequent removal of that diagnosis from DSM-III-R because of the high potential for misdiagnosis. We recognize, of course, that the mere fact that the label "isolated explosive disorder" is no longer applied to a particular set of symptoms and behaviors is not dispositive of the issue of insanity or even of the accuracy of Tourlentes' and Ward's initial diagnosis. Nevertheless, we believe it was one factor which the jury could consider in weighing the evidence of insanity. Given the conflicting evidence presented in this case, we are unable to conclude that the jury's finding was against the manifest weight of the evidence.

Defendant next contends that he was denied a fair trial when the prosecutor questioned Dr. Ward regarding an alleged misdiagnosis of a criminal defendant in a previous, unrelated proceeding. Defendant claims this was improper because the prosecutor did not possess admissible evidence to perfect the impeachment and also because the question was irrelevant.

On cross-examination, Ward was asked whether he had ever diagnosed a defendant as insane, only to have the defendant later claim that he had faked insanity. When Ward replied that no such case immediately came to mind, the prosecutor asked:

"Q. Do you know an individual named Ronald Uppole?

A. Yes, of course.

Q. You are aware that you earlier found him to be insane when he murdered his wife, are you not?

A. Yes.

Q. And he later claimed that he was faking those symptoms to you."

At that point, defense counsel made a motion for a mistrial and the trial judge and the attorneys had a discussion outside the presence of the jury. Although not entirely clear from the record, it appears that Ward may have testified that Uppole, who had murdered his wife, was insane at the time of the offense. Uppole was found unfit to stand trial and was placed in a mental institution. After Uppole was later found to be fit, he made statements during his trial that he had feigned mental illness at the time he was found unfit and thereafter. In denying the motion for a mistrial, the trial judge ruled that the prosecutor's question was improper, but that any error could be cured by instructing the jury to disregard the statement. To that end, the judge told the jury, in part:

"THE COURT: I was also the trial judge in the case referred to in the last question. I am aware of the facts in that case which, of course, have nothing to do with the facts in this case. The question that was asked was based on an inaccurate factual basis. Dr. Ward did not make any findings or testify that the defendant in that case was legally insane and therefore not responsible for the conduct charged. The facts of that case do not justify the question that was asked, and that question must be disregarded by you in its entirety. Although the question was inappropriate, you should certainly not hold that against anyone. You should simply disregard the question."

When an expert witness testifies regarding a defendant's sanity, the scope of inquiry into the basis for that opinion is broad. (*People v. Buggs* (1986), 112 Ill. 2d 284, 493 N.E.2d 332.) An expert may be cross-examined for the purpose of explaining, modifying or discrediting his testimony. (*People v. Williams* (1991), 214 Ill. App. 3d 499, 574 N.E.2d 62.) The scope of cross-examination lies within the discretion of the trial court, and its decision will not be disturbed unless an abuse of discretion results in manifest prejudice to the defendant. *Williams*, 214 Ill. App. 3d 499, 574 N.E.2d 62.

The State contends that the question posed to Dr. Ward was not improper, citing *People v. Charleston* (1985), 132 Ill. App. 3d 769, 477 N.E.2d 762. In *Charleston*, an expert testifying about a decedent's blood-alcohol level was impeached with evidence that he once made an error in a blood test conducted in another case. The *Charleston* court held that the jury had a right to know the extent of the expert's knowledge and experience and that his credentials and past record were relevant to those issues.

The defendant maintains that *Charleston* is inapposite because

blood-alcohol content is objectively verifiable, while a finding of insanity is largely subjective and is not susceptible to verification. Therefore, argues defendant, even if Ronald Uppole had claimed to be feigning insanity, such a claim would not impeach Ward's diagnosis because the prosecutor could not establish by independent evidence that Ward was incorrect. We agree that the questions concerning Uppole were objectionable, primarily because their impeachment value was minimal and they were largely collateral. We also find, however, that any error was cured by the trial court's instruction to the jury. Where a timely objection is made and the court sustains the objection or instructs the jury to disregard the answer, the error can usually be cured. (*People v. Boshears* (1992), 228 Ill. App. 3d 677, 592 N.E.2d 1187.) Here the court not only instructed the jurors to disregard the prosecutor's question, it dispelled any inference that Dr. Ward had misdiagnosed Uppole. We find that any error has been cured.

Defendant next contends that the trial court erred in allowing the State to cross-examine defendant's experts concerning the DSM-III-R. Specifically, defendant maintains that the fact that the diagnosis of isolated explosive disorder was omitted from DSM-III-R and that this was done because of the potential for misdiagnosis was irrelevant. Defendant argues that the psychiatrists' findings did not change from the first trial to the second, only the labels or terminology used to describe those findings changed. Therefore, according to defendant, the omission of isolated explosive disorder from DSM-III-R did not explain, qualify or discredit the experts' findings of insanity and should not have been admitted.

■ As we indicated in our earlier discussion regarding the weight of the evidence of insanity, we believe that the jury could properly consider the omission of isolated explosive disorder from the DSM-III-R. While isolated explosive disorder may only be a label, it is the particular label which both of defendant's experts chose to apply to his condition at the time of the offense. The subsequent omission of that label from the DSM-III-R was not insignificant, nor was the reason for that omission irrelevant. We find no error.

Defendant next asserts that he was denied a fair trial by the following jury instruction:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement [or] acted in a manner that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom." Illinois Pattern Jury

Instructions, Criminal, No. 3.11 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.11).

Defense counsel objected to this instruction on the basis that the trend in Illinois has been to follow the Federal Rules of Evidence, and those rules provide that when a witness is impeached with a prior statement made under oath, that statement may be considered as substantive evidence. Defense counsel then requested that IPI Criminal 2d No. 3.11 be modified "by inserting the word unsworn before the prior statement language." This request was denied by the trial court. On appeal, defendant notes that prior inconsistent statements made under oath have been admissible as substantive evidence under Illinois law since 1984. See Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.

■ We find that defendant has waived any error. Defense counsel did not argue the applicability of section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115— 10.1) to the trial court, nor did he submit an alternative instruction, even though a modified Illinois pattern instruction was available at the time of trial. (See Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. Supp. 1989).) An objection on specific grounds waives other grounds not specified. (*People v. Steidl* (1991), 142 Ill. 2d 204, 568 N.E.2d 837; *People v. Pollard* (1992), 225 Ill. App. 3d 970, 589 N.E.2d 175.) The burden of preparing jury instructions is primarily on the parties, and the trial court is not obligated to give instructions not requested by counsel or to rewrite tendered instructions. (*People v. Fetter* (1992), 227 Ill. App. 3d 1003, 591 N.E.2d 474.) No party may raise on appeal the failure to give an instruction unless he has tendered it. *Fetter*, 227 Ill. App. 3d 1003, 591 N.E.2d 474; *City of Naperville v. Lerch* (1990), 198 Ill. App. 3d 578, 555 N.E.2d 1187.

Moreover, even if this issue had been properly preserved, we would find any error to be harmless. The only inconsistent statement that the defendant claims should have been considered by the jury as substantive evidence concerns testimony by police officer David Frank. Frank testified that when he and Officer Tatum arrived at the Fierer residence, the defendant was lying on top of his wife's body and he was not responsive to orders or questions. According to Frank, he and Tatum then helped the defendant to his feet and he walked under his own power into a hallway where he was told to lie down. On cross-examination, Frank admitted testifying at defendant's first trial that he and Tatum had to physically pick defendant up and drag him out into the hallway. Defendant contends that if the jury had been allowed to consider Frank's prior inconsistent testimony as substantive evidence, it might have found the defendant not guilty by reason of insanity. We disagree.

Failure to instruct the jury regarding the use of prior inconsistent statements as substantive evidence does not require reversal unless there is a reasonable probability that the outcome of the trial would have been changed had the jury been properly instructed. (See *People v. Broadnax* (1988), 177 Ill. App. 3d 818, 532 N.E.2d 936.) There was no evidence presented that the defendant's ability or inability to walk shortly after the incident had any bearing on the issue of insanity. Under the circumstances, we believe that there is virtually no probability that the jury's finding of sanity would have been different if it had considered Frank's statement as substantive evidence.

Defendant next contends that the trial court erred in limiting his questioning of David Frank. On re-cross-examination, defense counsel asked Frank if he was still a police officer. The prosecutor objected, and during the ensuing discussion, defense counsel stated that he understood that Frank had resigned from the police force and had since applied to rejoin the force, and counsel believed that the fact of his reapplication showed bias or prejudice. The court ruled that the fact that Frank was no longer on the police force was irrelevant. Defendant maintains that this was error because Frank's leaving the force and applying for readmission "arguably provided him with an incentive to testify more favorably to the State at the second trial."

The confrontation clause of the sixth amendment guarantees a defendant the right to cross-examine a witness against him for the purpose of showing bias, interest or motive to testify falsely. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) It is well established, however, that a trial judge has wide latitude to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, or interrogation that is repetitive or of little relevance. (*Harris*, 123 Ill. 2d 113, 526 N.E.2d 335.) Any limitation of cross-examination is within the sound discretion of the trial court, and a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Frieberg* (1992), 147 Ill. 2d 326, 589 N.E.2d 508.

■ We find no abuse of discretion by the trial court, nor do we believe defendant was significantly prejudiced by the court's ruling. While Frank's application for readmission to the police force could conceivably raise an inference of bias, we deem that inference to be so weak that its exclusion would not have affected the result of the trial. *Cf. Frieberg*, 147 Ill. 2d 326, 589 N.E.2d 508 (limitation of cross-examination concerning plea agreement was harmless error where such evidence could not have contributed to defendant's conviction).

Finally, defendant contends that he was denied a fair trial by

various statements made by the prosecutors in closing and rebuttal arguments. Defendant asserts that the prosecutors misstated the evidence, unfairly attacked the credibility of defendant's expert witnesses and improperly disparaged defendant's insanity defense.

■ The defendant failed to object to any of the remarks to which he now complains. To preserve an issue for review, it is necessary that there be an objection at trial; failure to object results in waiver of the issue. (*People v. Hooper* (1989), 133 Ill. 2d 469, 552 N.E.2d 684; *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Notwithstanding defendant's failure to object, we have examined the allegedly improper statements to determine whether they were so serious that defendant was denied a fair trial. (See *People v. Sutherland* (1992), 155 Ill. 2d 1, 610 N.E.2d 1.) The prosecution is allowed a great deal of latitude during closing arguments, and comments based on facts in evidence or reasonable inferences drawn therefrom are proper. (*People v. Williams* (1991), 147 Ill. 2d 173, 588 N.E.2d 983.) Contrary to defendant's assertions, we do not find that the prosecution misstated the evidence or argued facts not in evidence. Overall, we find that the remarks complained of were fair comments on the evidence or inferences drawn therefrom. We find no error.

Defendant also complains that the prosecution unfairly attacked the credibility of his experts when it stated that their diagnoses were like chameleons, changing to fit the surroundings. Defendant argues that the witnesses did not change their diagnoses, they merely used different labels and "different jargon." It is not improper to comment on the credibility of witnesses where such comments are based on the evidence or reasonable inferences drawn therefrom. (*People v. Ramey* (1992), 151 Ill. 2d 498, 603 N.E.2d 519.) Although the reference to chameleons was an unnecessary exaggeration, it was clearly meant to emphasize the change in diagnostic "labels" used by the defendant's experts. This was not improper, and we find no error.

Defendant further contends that it was improper for the prosecutor to describe the insanity defense as "laughable" and "the defense everybody laughs at." It is clear, however, that these statements were made in response to defense counsel's statement that insanity was a defense that everyone laughs at. Where defense counsel provokes a response, a defendant cannot complain that the State's reply denied him a fair trial. (*Ramey*, 151 Ill. 2d 498, 603 N.E.2d 519.) We find no error.

Finally, defendant maintains that it was improper for the prosecutor to argue that defendant was trying to escape responsibility for what he did. Assuming that this comment was improper, we find that it was harmless error. Even if closing remarks are improper,

they do not constitute reversible error unless they result in substantial prejudice to defendant such that absent the remarks the verdict would have been different. (*People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003; *People v. Morgan* (1986), 112 Ill. 2d 111, 492 N.E.2d 1303.) We discern no substantial prejudice to defendant here.

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

BARRY and STOUDER, JJ., concur.